UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60050-CR-ALTMAN/HUNT(s)

UNITED STATES OF AMERICA

v.

MELANIE HARRIS,

    Defendant.

_____/

**UNITED STATES' MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER SETTING CONDITIONS OF RELEASE AND APPEARANCE BOND**

Pursuant to 18 U.S.C. § 3145 and 18 U.S.C. § 3148, the United States, by and through the undersigned Assistant United States Attorneys, hereby files this Motion for Revocation of Magistrate Judge's Order Setting Conditions of Release and Appearance Bond, supplementing its previously filed Motion for Stay of Magistrate Judge's Order Setting Conditions of Release and Appearance Bond (DE 47) (referred to herein as the "Motion for Stay"). At the request of the government, this Court entered an Order staying the Magistrate Judge's release order pending the resolution of this appeal. DE 48, 49.

At the time the government filed its Motion for Stay, it had not yet received the transcript of the defendant's initial appearance before United States Magistrate Judge Sheri Pym in Riverside, California, on July 20, 2023. However, the government now has received the transcript and filed it with the Court as an exhibit to a Notice of Filing. DE 51, 51-1. In this pleading, the government will cite to that transcript as DE 51-1. Having reviewed that transcript, the government remains of the view that this Court should reverse the Magistrate Judge's bond order and detain the defendant pending the conclusion of her case. Accordingly,

1

the government is submitting this bond appeal to supplement the facts presented and arguments made in its Motion for Stay.

### Procedural History and Current Bond Proceedings

Because the procedural history of this case, including the charges pending against the defendant and the initial bond proceedings prior to the defendant's new arrest, were laid out in the government's Motion to Stay, and referenced in the Court's Order (DE 49) staying Magistrate Judge Pym's release order, they will not be repeated herein at length.[1] Relevant to this appeal is the fact that at the time of her June 9, 2023 arrest by the Riverside Police Department, the defendant had been allowed to remain at liberty on a $50,000 personal surety bond that included as one of its standard conditions the requirement the defendant "not violate any federal, state or local law while on release in this case." DE 21, 24 at 1 ¶ 5.

On June 9, 2023, while living at her home in Riverside, California in the Central District of California as allowed by her bond conditions, the defendant was arrested by the Riverside Police Department ("RPD") for (1) misdemeanor domestic violence; (2) resisting, obstructing, or delaying arrest; and (3) assault on a police officer. On June 23, 2023, the Probation Office in the Central District of California informed Southern District of Florida Probation Officer Nelson Valenzuela of the defendant's arrest on these new state charges. Officer Valenzuela was also informed about a subsequent incident where the defendant apparently was enrolled in an inpatient psychiatric care facility after consuming a large quantity of some sort of psychotropic pills. The Probation Office then informed the Court of these incidents and on June 30, 2023, this Court issued an arrest warrant directing that she be

---

[1] Since this Motion for Revocation is supplementing the Motion for Stay, the government reincorporates that motion herein.

2

brought before the Court to answer the Petition charging her with a bond violation, in violation of 18 U.S.C. § 3148. That arrest warrant included the following provision: "Bail fixed at: <u>No Bond.</u>"

On July 20, 2023, the defendant was arrested at her home in Riverside, California, and was brought before United States Magistrate Judge Sheri Pym for her initial appearance on this Petition. During this hearing, the Probation Officer present explained that subsequent to being released by the RPD, the defendant allegedly overdoes on Xanax, resulting in the above-referenced inpatient mental health facility admission on June 19, 2023. DE 51-1 at 18. Despite the violent nature of the June 9, 2023, incident, including the defendant's resistance of lawful commands and physical assault on the arresting officer, her overdose of Xanax, and the defendant's complete lack of connection to the Southern District of Florida, Judge Pym chose not to honor the "No Bond" directive included as part of the arrest warrant.

Instead, Judge Pym stated that she found nothing that led her to believe either that the defendant would not voluntarily appear in the Southern District of Florida as ordered or that she presented an ongoing danger to the community if left on bond pending her hearing in Florida. DE 51-1 at 21. Based on those findings and conclusions, Judge Pym ordered the defendant to be released on essentially the same bond set by Magistrate Judge Augustin-Birch but stayed the defendant's release for approximately 24 hours to allow the government to seek a further stay before this Court.[2] DE 51-1 at 21-23.

---

[2] Judge Pym did add drug testing and no drug use conditions. DE 51-1 at 24-26. In addition, at this initial appearance, the defendant waived removal, and was directed to report in the Southern District of Florida no later than August 5, 2023. DE 51-1 at 5. The defendant also signed a written waiver of her right to an identity hearing. That Waiver of Rights (DE 9 in Case 5:23-mj-00356-DUTY, in the United States District Court for the Central District of California) is attached hereto as Exhibit 1.

Later that same day, during the evening of July 20, 2023, the government filed a motion asking this Court to stay the bond to keep the defendant in custody pending the resolution of this bond appeal. DE 47. That same night, the Court issued a paperless Order granting the motion to stay and directing that the defendant be held in pre-trial detention pending resolution of the government's bond appeal. DE 48. On the next day, July 21, 2023, this Court entered a written Order explaining in more detail its reasoning for issuing the No Bond warrant and staying the Magistrate Judge's Order and directing that the defendant remain in pre-trial detention pending resolution of this bond appeal. DE 49.

The government has inquired of the Marshal's Service when the defendant will be arriving in this District, but as of the time of filing this appeal, the government has not received any information about when the defendant is expected to arrive in the Southern District of Florida.

**Legal Standard for Consideration of Bond Appeal**

Upon motion by the government, the district court "having original jurisdiction over the offense" is permitted to review a magistrate judge's release order. 18 U.S.C. § 3145(a)(1). The district court must conduct a *de novo* review of the magistrate judge's pre-trial release order. *United States v. Hurtado,* 779 F.2d 1467, 1480 (11th Cir. 1985); *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988). This *de novo* review by the district court "requires the court to exercise independent consideration of all facts properly before it …." *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987); *King,* 849 F.2d at 490; *United States v. Buelvas*, No. 21-20090-CR, 2023 WL 4295318 at *1 (S.D.Fla. 2023) (citing *Hurtado* and *Gaviria*).

In considering this appeal, the Court's decision on whether to revoke the defendant's

pre-trial release is guided by 18 U.S.C. § 3148(b).  *See United States v. Wingo*, 490 F.App'x 189, 190-91 (11th Cir. 2012).  In relevant part, § 3148(b) requires the Court to enter an order of revocation and detention if, after a hearing, the Court finds either probable cause to believe the defendant committed a state or local crime while on release or finds by clear and convincing evidence that the defendant violated another condition of release; and the judicial officer, having found at least one of those prerequisites, then finds either that based on the 18 U.S.C. § 3142(g) factors, there are no conditions of release that will assure that the defendant does not flee or pose a danger to any other person or the community, or that the defendant is unlikely to abide by any conditions of release.  18 U.S.C. § 3148(b)(1)(A), (B); § 3148(b)(2)(A), (B).

In a revocation of release proceeding such as this, § 3148(b)(2)(A) specifically directs the court to make its determination on risk of flight and danger to other persons and the community "based on the factors set forth in section 3142(g) …"  Section 3142(g) requires that the Court consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Moreover, in considering the question of whether the defendant is a risk of flight, one of the factors the Court can consider is whether the defendant has strong ties to the Southern District of Florida.  That is because "[t]he relevant community is . . . the community in which the defendant faces prosecution.  In the federal system, courts look to the ties of a defendant to the judicial district in which the criminal charges have been brought."  *United States v. Rivera*, 90 F. Supp.2d 1338, 1343 (S.D. Fla. 2000) (ties to Middle District of Florida did not

5

rebut presumption of risk of flight since defendant lacked ties to Southern District of Florida where charged); *United States v. Rodriguez*, No. 11-02454-MJ, 2011 WL 1467221 at *2 (S.D. Fla. Apr. 18, 2011) (same); *United States v. Alverez-Lopez*, No. 2:14-cr-45-FtM-38CM, 2014 WL 2563646 at * 3 (M.D. Fla. 2014) (Middle District of Florida defendant found to be flight risk where all family ties were to Southern District of Florida and not the district of prosecution).

In this case, the defendant's recent conduct, when looked at in conjunction with the conduct charged in the Superseding Indictment and the overwhelming weight of the evidence of that conduct, including the recordings of the voicemails and calls that the defendant made that are the subject of the charges, and within the context of the defendant's history and characteristics, as required by § 3142(g), clearly supports revocation of her bond and an order holding the defendant in detention pending completion of her trial.

### There is Probable Cause to Believe that the Defendant Committed a State Crime While on Release, Thereby Satisfying the Requirement of § 3148(b)(1)(A)

As previously stated, the defendant, while on bond in this case, was arrested on June 9, 2023, at her home in Riverside, California after her live-in boyfriend called the police to report being assaulted by her. The RPD Case Report ("Case Report") written by RPD Officer Emily Ramos is attached to this motion as Exhibit 2, while the RPD Officer Report ("Officer Report") written by RPD Officer Claudia Gallardo to supplement the Case Report is attached hereto as Exhibit 3. It is the government's position that these two reports clearly establish probable cause to believe the defendant committed a state crime while on release, thereby satisfying the requirements of § 3148(b)(1)(A).

Moreover, as will be explained below, the defendant's violent conduct set out in the

Case Report, occurring as it did while on Federal pre-trial release, displayed a serious lack of respect for lawful authority, thereby escalating the risk she now poses if allowed to remain on bond.  Taken in conjunction with all the other facts and circumstances of this case and the other factors in § 3142(g), this new violent criminal conduct and her recent erratic behavior clearly support a finding both that no combination of conditions can assure that she will not flee or pose a danger to others or the community, and that she is unlikely to abide by any combination of conditions of release, thereby satisfying the requirements of both § 3148(b)(2)(A) and (b)(2)(B) for her to be held in detention pending trial.

According to Officer Ramos' Case Report, when she attempted to arrest the defendant on domestic violence charges based on the complaint made by the defendant's boyfriend, the defendant resisted arrest after she had been handcuffed and Officer Ramos was attempting to bring the defendant to her patrol vehicle.  During this effort, the defendant laid on the ground, kicked Officer Ramos in the leg, and claimed her shoulder had been injured by Officer Ramos, which required that the defendant be brought to a local hospital prior to booking.  In addition, at that point, the defendant began to hurl ethnic slurs at Officer Ramos, calling her a "Fucking Beaner."  Exhibit 2 at 8.

The defendant's harassing behavior escalated while she was being transported to, and after she arrived at, Riverside Community Hospital ("RCH") to be checked for any injury to her shoulder.  As Officer Ramos detailed in her Case Report, during the transport, "Harris continuously yelled 'Fuck your red burrito tampon … Why did you treat me so rough beaner.'  Upon arrival at RCH, S/Harris repeatedly yelled 'Let me see your green card .. you're probably a lettuce picking beaner ass … illegal immigrant … show me your fucking green

card, I know you know English bitch.'" Exhibit 2 at 8.[3] The Case Report also details the fact that the defendant's anger, resistance, and complete disrespect for lawful authority was on full display during her time at RCH, including creating a disturbance for patients and staff, again kicking Officer Ramos, and repeatedly calling Officer Ramos a "Fucking beaner" while she was being held down to prevent her from possibly attacking staff members. *Id*. at 9.

As detailed at the hearing before Magistrate Judge Pym, the intensity of the defendant's erratic behavior subsequently increased after her release from RPD custody when on June 19, 2023, she was admitted into a mental health facility due to an alleged overdose of Xanax. DE 51-1 at 18. At that hearing counsel for the defendant did not challenge that assertion, nor did he provide any additional explanatory information, and so it is reasonable to presume that this recent overdose and inpatient admission did in fact take place as described.

**Based on a Consideration of the § 3142(g) Factors, There is No Condition or Combination of Conditions that Will Assure that the Defendant Will Not Flee or Pose a Danger to the Safety of Other Persons or the Community, Thereby Satisfying the Requirement of § 3148(b)(2)(A)**

In considering the risk of flight aspect of § 3148(b)(2)(A), it is appropriate for the Court to consider whether the defendant has strong ties, or even any ties, to the Southern District of Florida where she has been charged. She has none that the government is aware of, and indeed, her sole connection to this District appears to be the fact that the recipients of her seemingly never-ending onslaught of vile anti-Semitic threatening and harassing calls and voicemails relocated to this District in mid-2019.

While this is only one factor that the Court should consider, the lack of connection to

---

[3] It is interesting to note that in an anti-Semitic voicemail relevant to the charged conduct, the defendant also used the word "tampon" along with a vile slur: "I got tampons for your shot up kiker grandma." This voicemail was previously provided to the defense in Confidential Discovery Production #4.

8

this District takes on a new significance now that she has abused the trust put in her by the Court by violating her bond. And, this violation was not simply a technical or minor violation. To the contrary, it was an incident that started with an assault on her boyfriend that she quickly escalated by resisting lawful authority and assaulting a police officer, all while hurling bigoted ethnic slurs at that Hispanic female arresting officer.

With this apparent complete lack of ties to the Southern District of Florida, any conditions of release would require the Court to trust the defendant to travel back to this district for pre-trial court appearances and then to secure a temporary residence during her upcoming trial. While the defendant was initially trusted to meet these requirements when she was released on bond, the defendant proved that this trust was misplaced by the actions leading to her new arrest. As a result, the record is now devoid of anything that would realistically support a finding that the defendant would satisfy these conditions.

To the contrary, the defendant's complete lack of ties and the nature of her conduct as alleged in the Superseding Indictment, combined with her recently displayed willful disregard of the Court's authority by violating the conditions of her bond, create a significant risk that the defendant will not voluntarily travel across the country to appear in this District to face the possibility that this Court will revoke her bond for her new criminal conduct. That same concern also applies regarding her coming to, and remaining in, this District for her trial, knowing that she faces the possibility of significant incarceration should she be convicted. Simply put, the defendant seriously abused the trust placed in her, and her new conduct, added to all the facts and circumstances of this case, certainly supports a finding that there are no conditions that can reasonably assure the appearance of the defendant as required for all court appearances.

The same considerations come into play in determining whether there still are any conditions of release that can reasonably assure the safety of other persons or the community in the wake of the defendant's new violent and erratic behavior in contravention of the promises she made to obey all the conditions of her bond when she was allowed to remain at liberty pending trial.  It is the government's position that the record of this case now compels that the answer to this question is no.  Having betrayed the trust of this Court and actively resisted the RPD's exercise of lawful authority in responding to her assault on her boyfriend, the record supports this Court in finding that unless she is held in pre-trial detention, the defendant will pose a serious risk to other persons, including possibly the victims in this case, as well as the community at large, and the Jewish community in particular in any area where she is allowed to remain at liberty.

Because the government described the nature of the conduct underlying the seven counts of the Superseding Indictment in its motion to stay, that description will not be repeated herein.  However, in essence, the Superseding Indictment alleges that the defendant besieged the victims with a flood of threatening and harassing calls and voicemails.  These included not only specific threats to kill them and others, but also an endless stream of vicious anti-Semitic harassment and gloating over the death of Jews who had been murdered, including vile comments about "kikes," "kikers," "shot grandmas," Anne Frank, and Auschwitz.[4]  Some of these calls and voicemails also included graphic and violent sexual references and/or racist slurs, including the "N-word" and another derogatory term for African Americans.

---

[4] The tern "kike" is a derogatory slur against Jews.  The defendant also regularly used the term "hymie," which is another derogatory term for Jews.  For example, on October 3, 2022, in Voicemail 1137 that is specifically listed in Count 7, the defendant spends almost all of the one minute eighteen (1:18) second call repeating the phrase "Run back to Auschwitz hymie."

10

For example, the November 28, 2022 voicemail identified as Voicemail 1190 in Count 7 of the Superseding Indictment is approximately one minute and fifty four seconds (1:54) long. That voicemail begins: "Hide like the hymie, kike, [Victim 3's first name]." The defendant then repeatedly chants that "Jew kikes are spineless" before moving on to continuously repeat "Kike Anne Frank died pregnant." The voicemail finally wraps up in chilling fashion with the defendant saying, "Bless the SS" and then shouts the following: "Seig Heil. Kill kikers. Seig Heil. Kill kikers. Seig Heil. Kill kikers. Seig Heil. Kill kikers. Seig Heil. Kill kikers."

While this indicted conduct obviously occurred before the original bond was set, it takes on added significance now that the defendant has shown through her recent violent and irrational actions that she does not respect lawful authority and thus cannot be trusted to comply with any conditions of release the Court might fashion to allow her to remain at liberty while also reasonably assuring the safety of others and the community in general. As such, the government now believes that if the defendant is released, she will pose a serious danger to other persons and the community. And for that reason, the government is urging the revocation of her bond pending trial.

Moreover, the defendant not only poses a potential risk to the victims and to the community at large, but she also poses a particularly serious risk to the Jewish community wherever she is allowed to reside if released. The fact that the defendant has now shown by her recent actions that she is unwilling and/or unable to respect lawful authority and control her violent impulses makes her calls and voicemails even more menacing, not only because of her obvious hatred of Jews, but also because some of them include expressions of her apparent belief that Jews are specifically targeting or taking actions against her in some way.

These include Voicemail 1128, which is the basis for Count 2 ("You better make that kike, those kikers shut up talking and to my house kike or else, I'll take, I'll go to you and fucking box behead your s-, motherfucking kike dad"); Voicemail 1140 identified in Count 7 ("A lot of hymies talking into my house"); Voicemail 1172 identified in Count 7 ("And no, I'm not going to stop calling, kike, 'til your fucking kikes stop calling me, kike. Ya' bleeding ass kike."); Voicemail 1184 identified in Count 7 ("You wanna play hymie games with me. I can third reich things with you, kike Jew"); and Voicemail 1203 identified in Count 7 ("You fuck with my friends again, I'm gonna take your little kikes and suck 'um up their fucking assholes, kike").

This pairing of an obvious obsession with, and overwhelming hatred of, Jews, and a repeated belief that Jews are somehow taking actions against her and bothering her and her friends, becomes particularly toxic and dangerous in light of the defendant's recent violent and erratic actions that led to her arrest for violating the terms of her release. Looked at in the light of these recent events, all the facts and circumstances of this case establish that there are no conditions that can reasonably assure the safety of any person or the community. Accordingly, the defendant should be detained pending trial pursuant to § 3148(b)(2)(A).

**The Defendant is Unlikely to Abide by Any Condition or Combination of Conditions of Release, Thereby Satisfying the Requirement of § 3148(b)(2)(B)**

The strongest proof that the defendant is unlikely to abide by any conditions of release is her own actions while on her bond in this case. She violated her bond by committing violent crimes, including assaulting a police officer while that officer was trying to exercise her lawful authority. That violent conduct was followed by an apparent episode of erratic uncontrolled behavior involving what was described at the hearing before Magistrate Judge Pym as a Xanax

overdose resulting in an inpatient admission to a mental health facility.

New conduct of this type, particularly in a case involving repeated, hate-driven threats to kill the victims, shows that there is no reason to believe that the defendant will comply with any conditions of release. In support of this conclusion, the government reincorporates by reference all the other arguments and factual recitations set out in this appeal to avoid the necessity for repetition. Because the defendant is unlikely to abide by any conditions of release, her bond should be revoked and she should be detained pending trial pursuant to § 3148(b)(2)(B).

**Position of Opposing Counsel**

The undersigned has telephonically consulted with the defendant's counsel, Assistant Federal Public Defender Andrew Jacobs, and he has indicated that the defendant opposes the government's appeal of Magistrate Judge Pym's order setting conditions of release.

(remainder of page intentionally left blank)

**Conclusion**

For all the above-stated reasons, the government respectfully requests that this Court enter an Order (1) overturning the Order Setting Conditions of Release and Appearance Bond issued by the Magistrate Judge in the Central District of California; and (2) directing that the defendant be held in detention pending completion of her trial.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:  /s/ *Edward N. Stamm*
     Edward N. Stamm
     Assistant United States Attorney
     U.S. Attorney's Office – SDFL
     FL Bar #373826
     99 NE 4th Street, 8th Floor
     Miami, Florida 33132
     Tel: (305) 961-9164
     Email: Edward.Stamm@usdoj.gov

By:  /s/ *Nardia Haye*
     Nardia Haye
     Assistant United States Attorney
     U.S. Attorney's Office – SDFL
     Court ID No. A5502738
     99 NE 4th Street, 6th Floor
     Miami, Florida 33132
     Tel: (305) 961-9326
     Email: Nardia.Haye@usdoj.gov