UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60050-CR-ALTMAN/HUNT(s)

UNITED STATES OF AMERICA

v.

MELANIE HARRIS,

    Defendant.

---

**UNITED STATES' MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE**

The United States, by and through the undersigned Assistant United States Attorneys, respectfully files this Motion for Upward Departure and/or Variance, asking this Court to impose a sentence of 36 months in prison followed by 3 years of supervised release, stating as follows:

**Factual Background and Procedural History**

    **The Superseding Indictment**

On March 21, 2023, a federal grand jury returned a seven-count Superseding Indictment (DE 7) charging the defendant with: six counts of knowingly and intentionally transmitting communications in interstate commerce that contained threats to injure the person of another, with the intent to communicate a true threat and with knowledge the communications would be viewed as true threats, in violation of 18 U.S.C. § 875(c) (Counts 1-6); and, one count of making repeated phone calls and initiating communications in interstate commerce solely to harass Victim 1, who was the person routinely using the phone number that the defendant was calling, in violation of 47 U.S.C. § 223(a)(1)(E) (Count 7).

The threats contained in Counts 1 through 6 of the Superseding Indictment charged were voicemails threatening to behead Victim 1, his stepchild Victim 3 through the defendant's use of Victim 3's first name, Jamie, and other family members of Victim 1, as well as to kill Jews in general. These threats were contained in six separate voicemails the defendant left on Victim 1's cell phone on October 3, 2022, November 22, 2022, and December 6, 2022. The pattern of harassment charged in Count 7 consisted of the defendant making repeated phone calls and communications solely to harass Victim 1, specifically through the fifty-four (54) separate calls (including voicemails left) to Victim 1 during the period of October 3, 2022 through January 3, 2023, that are specifically identified in Count 7.

The defendant's calls and voicemails included in the Superseding Information were filled with virulent anti-Semitic content and gloating over the death of Jews who had been murdered, including vile comments about Anne Frank. Some of these voicemails and calls also included graphic and violent sexual references and/or racist slurs. The PSR provides excerpts of the threats contained in Counts 1 through 6, as well as excerpts of a sample of the calls and voicemails that made up the pattern of harassment charged in Count 7. PSR at ¶¶ 13, 14. As the PSR describes, these calls and voicemails were replete with references to "kikes," "shot grandmas," "Auschwitz," "Anne Frank," and even included a November 27, 2022 voicemail where the defendant said, "You wanna play hymie games with me. I can Third Reich things with you, kike Jew."[1] Yet perhaps the clearest example of the viciousness of the anti-Semitic hate that the defendant was inflicting upon the victims can be found in voicemail 1190.[2] That nearly 2-minute long voicemail concludes with the defendant

---

[1] This 16-second voicemail (voicemail 1184) was included as entry 27 in Count 7.
[2] Voicemail 1190 was included as entry 33 in Count 7.

screaming, "Seig Heil, kill kikers" five times.

However, the defendant's torment of the victims did not begin on October 3, 2022. Rather, October 3, 2022 marked a frightening escalation of the defendant's conduct. And the seriousness of that conduct can only truly be understood when it is placed into the context of who the victims were, what they had been through before the defendant's voice entered their life, and what they had to endure from her after that voice appeared.

### The Victims and the Tree of Life Synagogue

From 1995 through July 2018, Victim 1 was the Executive Director of the Tree of Life Synagogue ("Tree of Life") in Pittsburgh, Pennsylvania. Victim 1 and his wife, Victim 2, also were long time members of, and closely associated with, the Tree of Life. Victim 3, whose first name is Jamie, is the adult child of Victim 2, and the stepchild of Victim 1. Prior to becoming the targets of her threats and harassment, none of the victims had any prior connection to the defendant. PSR at ¶ 7.

The Tree of Life became the focus of national attention on Saturday, October 27, 2018, when a gunman, inspired by hatred for Jews, went on a murderous rampage, killing 11 people, many of them older congregants, and wounding a number of others before being apprehended.[3] Days after the October 27, 2018 massacre, Victim 3 was asked by a nationally known publication to write a piece about their experiences at the Tree of Life, looking back in the aftermath of the attack. This article, which appeared in the online version of Vanity Fair dated October 29, 2018, contained many personal recollections relating to the Tree of Life, including of a 97-year synagogue member murdered as she was attending Shabbat

---

[3] As noted in the PSR at ¶ 6, the government is not claiming that the defendant had any involvement with the actual massacre at the Tree of Life.

services. Victim 3's article also made it clear that Victim 1, Victim 2, and Victim 3 were Jews who were actively involved with the Tree of Life. PSR at ¶ 8.

### The Defendant's Calls Starting on February 7, 2019

The toll records obtained during the investigation show that the defendant placed her first two calls to Victim 1 at approximately 12:41 p.m. and 12:42 p.m. on February 7, 2019, immediately after she made a call to the Tree of Life at approximately 12:40 p.m. on that same day. PSR at ¶ 10. The defendant made all these calls and those that followed using the "*67" feature, which allowed her to hide her phone number from Victim 1 and the Tree of Life. These early calls and voicemails were laden with anti-Semitic and harassing language, including implied references to the Tree of Life massacre. In addition, the defendant made frequent references to and aimed anti-Semitic slurs at "Jamie." PSR at ¶ 9.

During this same time frame, the defendant continued calling the Tree of Life and leaving strikingly similar anti-Semitic and offensive voicemail messages. Notably, voicemails left by the defendant that the Tree of Life provided to the Pittsburgh Police Department not only were anti-Semitic and profane rants gloating about the shooting of "your kike grandmas" but they also frequently included the defendant repeating the name Jamie in the same drawn out manner and voice that she used in her calls to Victim 1. Indeed, the words spoken on the Tree of Life voicemails were virtually identical to and interchangeable with those the defendant used in her calls to Victim 1. PSR at ¶ 10; DE 53 at 6.

Victim 1 and Victim 2 left the Pittsburgh area in the Spring of 2019 and moved to Broward County. After moving to south Florida, Victim 1 maintained the same cell phone number that he had while living in Pittsburgh, in part so that he could maintain his ties with the Pittsburgh Jewish community. Victim 3 did not reside with Victim 1 and 2, but did reside

4

in the Pittsburgh area beyond the time Victim 1 and Victim 2 did, until eventually relocating outside of Pennsylvania. PSR at ¶ 11.

After the initial burst of harassment in 2019, when the phone records show approximately 44 calls to Victim 1, things grew relatively quiet, with only 9 total calls in the period of time spanning from the beginning of January 2020 through to March 2022. However, this relative quiet did not last because the defendant returned with a vengeance on October 3, 2022, unleashing the flood of viciously anti-Semitic threats and harassment charged in the Superseding Indictment in this case.[4]  PSR at ¶ 12.

**The Defendant's Arrest and the Course of Proceedings Leading to Sentencing**

On March 4, 2023, the defendant was arrested and made her initial appearance in the Central District of California. The defendant waived her right to an identity hearing and was released on bond pending an appearance in this district. DE 13. The defendant made her initial appearance in this district via Zoom on April 21, 2023, where she was arraigned and allowed to remain at liberty on a $50,000 personal surety bond. DE 21.

On July 20, 2023, the defendant was arrested in the Central District of California after the Probation Office sought a warrant based on a state domestic violence and resisting police arrest of the defendant in June 2023. Although the Magistrate Judge in that district ordered that the defendant be allowed to remain on bond, the government sought to stay that order and to revoke the defendant's bond. DE 47. This Court stayed that release order and directed that

---

[4] While the Superseding Indictment includes 59 separate calls or voicemails, an analysis of the phone records obtained shows that the defendant made far more than 59 calls to Victim 1 during this time. Those calls were unanswered or were immediately hung up or did not result in voicemails. That analysis showed the following approximate numbers of calls from the defendant to Victim 1: 32 calls in October 2022; 129 calls in November 2022; 26 calls in December 2022; and 3 total calls in January and February 2023.

5

the defendant be held in pre-trial detention pending a final hearing on the matter.  DE 48, 49.  The defendant subsequently stipulated to pre-trial detention pending resolution of this matter.

On March 4, 2024, the defendant appeared before Magistrate Judge Jared M. Strauss and entered a plea of guilty to Count 4 of the Superseding Indictment pursuant to the plea Agreement in this case.  DE 78, 80.  On March 6, 2024, this Court accepted Magistrate Judge Strauss' Report and Recommendation on the change of plea, and set the matter for sentencing on May 23, 2024.  DE 81, 83, 84.

## MEMORANDUM OF LAW

### The Advisory Sentencing Guidelines Range

Under the current post-*Booker* sentencing regime, this Court is required to first compute an advisory Guidelines range, before it applies the 18 U.S.C. §3553(a) factors to determine the defendant's ultimate sentence.  *See United States v. Crawford*, 407 F.3d 1174, 1178-79 (11th Cir. 2005).  The PSR computed the Total Offense Level to be level 14.  PSR at ¶¶ 20-29.  The PSR then determined that the defendant has one criminal history point arising from a 2014 battery conviction for which she received 30 days in jail and 36 months of probation, resulting in her being in Criminal History Category I.  PSR at ¶¶ 31-33.  Based on a Total Offense Level of 14 and Criminal History Category I, the PSR recommends that the defendant's advisory Guidelines sentencing range should be 15-21 months.  PSR at ¶ 69.

However, although the Court is required to accurately compute the advisory Guidelines range, that is only one of the considerations the Court must take into account in determining the sentence to be imposed.  It is for sentencing courts to determine on a case-by-case basis the weight to give to the Guidelines, so long as that decision is made with

reference to the remaining § 3553(a) factors that must also be considered. See *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (affirming as reasonable 87-month sentence imposed where advisory range was 21-27 months). Because of their "institutional advantage[s]" in determining sentences, district courts are given broad discretion to determine whether the § 3553(a) factors justify a variance and if so, the extent of that variance. *United States v. Shaw*, 560 F.3d 1230, 1237-38 (11th Cir. 2009). Sentencing courts also are allowed to attached great weight to one § 3553(a) factor over others. *Rosales-Bruno*, 789 F.3d at 1254, *citing Shaw*, 560 F.3d at 1237.

While the government agrees that the PSR has correctly computed the advisory Guidelines, the government does not believe that a sentence within that range is sufficient to satisfy the purposes of sentencing as set out in 18 U.S.C. § 3553(a)(2). To the contrary, looking at the specific facts and circumstances of this case and this defendant, the government believes that a significantly higher sentence is required to provide a sufficient sentence, and therefore it urges this Court, to depart upward and/or vary upward from this 15-21 month advisory range to impose a sentence of 36 months in prison followed by three years of supervised release.

**An Upward Departure is Both Necessary and Appropriate**

**Section 5K2.0 of the Sentencing Guidelines**

Section 5K2.0 of the Sentencing Guidelines, which outlines grounds for departure, permits sentencing courts to "depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating . . . circumstance[.]" U.S.S.G. § 5K2.0(a)(1)(A). In reviewing § 3553(b), sentencing courts should assess whether "there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken

into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b)(1).

A careful review of § 2A6.1, which is the Sentencing Guidelines provision applicable to the defendant's crime of conviction, leads to the necessary conclusion that in this case, there are aggravating circumstances not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. For instance, § 2A6.1(a)(1) applies the same base offense level of 12 to a broad spectrum of offenses of varying degrees of seriousness, ranging from hoaxes to false liens to serious and long-running threatening communications such as in this case. This lack of differentiation results in the base offense level being inadequate to address the underlying conduct in a case such as this, which featured threatening and harassing anti-Semitic communications spanning four years.

Further, Sections 5K2.0(a)(2)(B) and (a)(3) authorize courts to impose an upward departure in "exceptional" cases. U.S.S.G. § 5K2.0(a)(1)(B), (a)(3). Specifically, Section 5K2.0(a)(2)(B) defines an exceptional case as "a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." *Id*. at (a)(2)(B). In this case, § 2A6.1 does not identify threats or harassment that take place over a prolonged time period or that involve multiple victims, as a specific offense characteristic. However, these factors are certainly relevant in determining the scope and breadth of the defendant's conduct.

Moreover, Section 5K2.0(a)(3) categorizes cases as exceptional if "the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range," but "the court determines that such circumstance is present in the offense to a degree *substantially* in excess of . . . that which ordinarily is involved in that kind of offense."

8

U.S.S.G. § 5K2.0(a)(3) (emphasis added).  Application Note 3(B)(ii) provides an example: while "the robbery guideline includes a specific adjustment based on the extent of any injury[,]" it does not account for "injury to more than one victim," thus, an upward "departure may be warranted if several persons were injured." *Id*. at cmt. n. 3(B)(ii).

Similarly, here, the limited number of specific adjustments provided in § 2A6.1(b) are inadequate to address a situation such as the one this case presents.  The only specific offense characteristic that addresses the number of threatening communications is § 2A6.1(b)(2), which increases the offense level by 2 levels if the offense involved more than two threats. This 2-level increase applies whether there were 3 threats or 300 threats, exposing its inadequacy in this case.[5]  The one-size fits all approach adopted by the Sentencing Commission regarding this enhancement also stands in stark contrast to the way fraud and theft and drug offenses are treated by the Guidelines, where the financial loss table, § 2B1.1(b)(1)(A)-(P), and the drug quantity table, § 2D1.1(c), have multiple levels of enhancement to more effectively reflect the greater or lesser nature of a crime based on the amount of loss or of controlled substances involved.

### Section 2A6.1 of the Sentencing Guidelines

The need for an upward departure is bolstered by the fact that Section 2A6.1 provides a basis for upward departure for the above mentioned reasons.  Application Note 4(A) of § 2A6.1 explains that "[f]actors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted." U.S.S.G. § 2A6.1,

---

[5] This serious inadequacy is not remedied by the 3-level increase that applies because the record establishes beyond a reasonable doubt that the defendant intentionally selected any victim because of their actual or perceived religion.  That increase addresses the defendant's hate crime motivation, not the number or duration of the threats.  Simply put, an increase based on the *quality* of the defendant's conduct cannot remedy the Guidelines' failure to properly account for and reflect the great harm caused by the large *quantity* of the defendant's criminal conduct.

cmt. n. 4(A). Accordingly, Application Note 4(B) delineates five factors which may warrant an upward departure—three of which are present here: 1) substantially more than two threatening communications to the same victim; 2) a prolonged period of making harassing communications to the same victim; and 3) multiple victims. U.S.S.G. § 2A6.1, cmt. n. 4(B).

To start, the undisputed facts outlined in the PSR plainly establish that this case involves substantially more than two threatening communications to the same victims. The first calls made to Victim 1's cell phone began in early February 2019, which included voicemails laden with anti-Semitic and harassing language, and implied references to the Tree of Life massacre. PSR ¶ 9. That was just the beginning. In 2019 alone, the defendant made approximately 44 calls to Victim 1. *Id*. at ¶ 12. She made an additional 9 calls from January 2020 through March 2022. *Id*.

From there, the defendant's calls escalated both in number and in threatening nature from October 2022 to January 2023, which, as previously discussed, is the basis for the charges in the Superseding Indictment. During that time period, the defendant made numerous calls to and left voicemails for Victim 1 littered with hate, violence, and even threats mentioning Jaime. PSR at ¶¶ 13-14. In fact, Victim 2 informed the FBI that on some days, the defendant called Victim 1's cell phone over 27 times back-to-back, forcing Victim 1 to turn off his phone. *Id*. at ¶ 15.

When considering calls that went unanswered, were immediately hung up, or that did not result in voicemails, from October 2022 to February 2023, the defendant called Victim 1 approximately 190 times. That amounts to approximately 243 calls in total, beginning in February 2019. Undoubtedly, this is substantially more than two threatening communications to the same victims. In addition to the considerable volume of calls, the harm the defendant

caused the victims intensified as the threats and harassment continued over a prolonged period of time.

Finally, the Court should depart upward because the defendant's conduct affected multiple victims. There were three victims. Though the defendant only called Victim 1's cell phone, the defendant directly named Jaime (Victim 3) throughout her tirade of threats and harassment. The defendant's callous and anti-Semitic threats also greatly impacted Victim 2, as Victim 1's wife, Jaime's mother, and as a member of the Jewish community. Additionally, Victim 2 was a participant in some of the calls that were answered. Thus, an upward departure is warranted based on the factors present in this case.

### Section 5K2.8 of the Sentencing Guidelines

Additionally, § 5K2.8 of the Sentencing Guidelines provides another basis for upward departure where a "defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim[.]" Under those circumstances, "the court may increase the sentence above the guideline range to reflect the nature of the conduct." This includes instances involving "torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." U.S.S.G. § 5K2.8.

In this case, the defendant's threats were particularly cruel and degrading to the victims. The defendant made implied references to the Tree of Life massacre, which involved the murder of a 97-year-old Jewish woman attending Shabbat services, when she referred to "shot grandmas." This was especially cruel given each victim's close, intimate relationship with the Tree of Life and its members. The cruel and degrading nature of the defendant's threats were exacerbated as she repeatedly named Jaime in disturbing threats such as, "I'll behead you kid upside her clit, kike. Cry hymie kike Jaime."

This was compounded by the fact that the victims endured these sadistic messages and phone calls, sometimes back-to-back, over a prolonged period of four years. *See United States v. Taylor*, 88 F. 3d 946-47 (11th Cir. 1996) (departure under § 5K2.8 based in part on the " the degrading nature of some of the communications" and the defendant's "prolonged, unrelenting behavior, much of which was designed to humiliate the [victims]") (citing both *United States v. Moyano,* 983 F.2d 236 (11th Cir. 1992) (per curiam) (unpublished) (departure under § 5K2.8 warranted based on hundreds of communications over four-year period) and *United States v. Gary,* 18 F.3d 1123, 1130 (4th Cir. 1994) (departure under § 5K2.8 based in part on frequency and duration of harassing and threatening communications over two-year period)). Likewise, an upward departure is warranted under these facts.

**An Upward Variance is Necessary to Provide a Sentence Sufficient to Satisfy the Purposes Set Forth in 18 U.S.C. § 3553(a)(2)**

Title 18, United States Code, Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2). In making this ultimate determination, the Court is directed to consider all the factors laid out in § 3553(a)(1)-(7).

**Section 3553(a)(1) – The Nature of Defendant's Offense**

The first part of §3553(a)(1) focuses on the nature and circumstances of the offense committed. As described in detail above, the defendant's offense conduct was extremely serious. It involved a four-year pattern of virulent anti-Semitic harassment and threats that included specific threats to kill Victim 1 and his family members.

The content of the calls and voicemails, including the repeated references to Jamie and the references to the victims of the Tree of Life massacre, showed an apparent awareness of who the victims were, and presumably where they were, and as such, substantially increased

the fear they instilled in the victims. That fear was also enhanced by the fact that the calls started only a few months after the horrific events at the Tree of Life, where Victim 1 had been the Executive Director for many years and where the victims had been members.

Significantly, apart from hearing her voice on her calls and voicemails, the victims had no idea who she was or where she was calling from, since the defendant used the *67 feature to hide her number from Victim 1. While the defendant actually was calling from Riverside, California, the victims had no way of knowing this. Not knowing who or where she was or what she looked like, the victims were left to wonder whether she might be watching them at any moment, greatly accentuating the threatening nature of the defendant's criminal conduct. The psychological pain and suffering inflicted by the defendant will also be explained by the victims, all of whom have informed the government that they are planning to attend the sentencing and present their victim impact statements to the Court.

### Section 3553(a)(1) – The Defendant's History and Characteristics

The second part of §3553(a)(1) focuses on the history and characteristics of the defendant. According to the PSR, the defendant has two prior criminal convictions, the most recent of which occurred in 2013, and also has had three arrests for charges involving physical violence, the most recent of which was the June 9, 2023, arrest for battery and obstructing a police officer that led to her bond being revoked in this case. PSR at ¶¶ 31-37.

The government acknowledges, as the PSR describes at ¶¶ 48-54, that the defendant has mental health issues, but does not agree that these mental health issues support a sentence within the advisory Guidelines range. The defendant's criminal conduct was not merely one or two spontaneous calls or outbursts made in anger or in the heat of the moment. To the

13

contrary, despite being in Riverside, California, the defendant made the decision to call the Tree of Life in Pittsburgh, and then immediately thereafter to call Victim 1, who had been the Executive Director for the Tree of Life for many years, beginning four years of anti-Semitic hate, threats, and harassment that she imposed on the victims. And she also continued to call the Tree of Life, leaving the same type of vile voicemails that she left on Victim 1's phone, until the Tree of Life finally blocked her anonymous calls.

Looked at in the context of her criminal conduct, the government believes that the defendant's mental health conditions should be accounted for not by reducing or limiting the length of her sentence, but rather by ordering that meaningful and appropriate mental health treatment be provided during her period of incarceration, which the government believes should be 36 months in prison.

### Section 3553(a)(2)(A)-(D)

Section 3553(a)(2) is aimed at ensuring that the sentence imposed serves the various purposes stated in subparts (A) – (D), including: (A) imposing a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; (B) provides adequate deterrence to criminal conduct; (C) protects the public from further crimes by the defendant; and (D) provides the defendant with needed medical care and correctional treatment in the most effective manner. Every facet of this subsection supports the government's request for a significant upward variance.

The undisputable seriousness of the defendant's criminal activity has already been discussed above. A sentence within the advisory Guidelines range of 15-21 months would fall woefully short of truly reflecting that seriousness and providing just punishment to the

defendant, who made her hateful anti-Semitic threatening and harassing calls to Victim 1 for four years. Yet even just looking at the three-month period charged in the Superseding Indictment, the victims were assailed with almost 60 hateful and virulently anti-Semitic threatening and harassing calls and voicemails from a stranger hiding her phone number, leaving the victims to wonder who she was, and more importantly, where she was. The damage done by the defendant's conduct was serious and lasting, and far more than 15-21 months in prison is necessary to reflect that seriousness and impose a just punishment.

Similarly, a sentence within the advisory Guidelines range would be wholly inadequate to serve the important purpose of providing adequate deterrence to criminal conduct by others. Particularly now, in a time of significantly increasing anti-Semitic threats and violence, a sentence significantly higher than even the 21-month high end of the advisory Guidelines range is required to send an effective message of deterrence to those who might be considering similar hateful conduct. The government believes that a 36-month prison sentence is a reasonable sentence that will send a strong message of deterrence to others considering this type of criminal conduct.

The government also believes that the above-Guidelines sentence it is recommending is necessary to both protect the public from further crimes by the defendant, and to ensure that the defendant receives the necessary medical and correctional treatment for a long enough period of time to address the mental health issues she is dealing with. While the government acknowledges that the defendant has not contacted Victim 1 since she was arrested, it is unknown whether the defendant will once again engage in this type of behavior, particularly after she is released from prison and loses the structured mental health treatment environment

that can be provided in a custodial setting.[6]  Thus it is impossible to predict whether the defendant truly has changed, a concern noted in the PSR at ¶ 53.  Faced with these concerns, the government believes that its recommended sentence of 36 months is the minimum sentence adequate to serve the dual purposes laid out in § 3553(a)(2)(C) and (2)(D).

### Section 3553(a)(3), (a)(4), (a)(5)

These subsections of §3553(a) require consideration of the kinds of sentences available, the advisory Guidelines sentencing range established for the category of offense committed by the applicable category of defendant, and any pertinent policy statements issued by the Sentencing Commission, in determining the final sentence.  As explained in greater detail above, both Section 5K2.0 and Application Note 4(B) of § 2A6.1 of the Sentencing Guidelines provide the bases for an upward departure in this case, but for those same reasons, they also provide a basis for an upward variance, and those arguments are reincorporated herein for that purpose.

In particular, although Application Note 4(B) speaks in terms of an upward departure, § 3553(a)(5) requires that pertinent Guidelines policy statements must also be considered in determining the ultimate sentence to be imposed.  As such, the rationale of Application Note 4(B) also supports the upward variance being sought, since it reflects the Sentencing Commission's candid recognition that in cases such as this one, where the criminal conduct involved an almost four-year pattern of threatening and harassing communications to the same victims, § 2A6.1 is likely to result in an advisory Guidelines sentencing range that is not

---

[6] This concern is not merely speculative since the defendant had an over two-year period with almost no calls to Victim 1 until she returned with a vengeance on October 3, 2022.

sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protects the public from further crimes by the defendant, and provide the defendant with needed medical care and correctional treatment in the most effective manner.

That is in fact the case here, where a sentence within the 15-21 month range would be wholly inadequate. In contrast, the government respectfully suggests that the 36 month sentence it is seeking is sufficient, but not greater than necessary, to comply with those purposes set out in § 3553(a)(2), making it the necessary and reasonable sentence for this defendant's offense.

### Section 3553(a)(6)

This sub-section focuses on avoiding sentencing disparity. Here, a sentence within the advisory Guidelines range would create disparity because it would treat this defendant's four years of vicious anti-Semitic harassment and threats as the equivalent of cases involving only one or a limited number of threats in a short period of time.

For example, in *U.S. v. Hanson Larkin*, Case No. 19-20702-Cr-MARTINEZ, the defendant was a mentally troubled young man who hated Jews and was involved in an online relationship with an older man. When the victim refused to meet in person, the defendant sent a series of texts on the same day threatening to kill Jews if the victim would not relent. The defendant then left the area having taken no action to harm anyone. Larkin pled guilty to a violation of 18 U.S.C. § 875(c) and received a sentence of 14 months in prison.

Similarly, in *U.S. v. Gerald Wallace*, Case No. 17-20354-Cr-COOKE, the defendant called a local mosque and left a voicemail expressing his hatred for Islam and Muslims, and

stating he was coming to shoot everyone. However, the defendant actually took no action. He did not block his phone number and authorities quickly identified him by using the mosque's caller ID. He was arrested days later and admitted he left the message after a news story angered him, telling authorities about similar messages he left in the past. He pled guilty to a violation of 18 U.S.C. § 247(a)(2) and was sentenced to 12 months and 1 day in prison.

The defendant's four-year pattern of conduct, aided by her deliberate concealment of her phone number, was far more serious and deliberate than the spur of the moment threats made by Larkin and Wallace. As such, this defendant's conduct deserves a far more serious sentence. Specifically, the government believes that 36 months in prison, a sentence that is double the mid-point of the advisory Guidelines range, is both necessary and sufficient to avoid unwarranted sentencing disparity in favor of the defendant.

### Section 3553(a)(7)

This sub-section addresses the need to ensure that restitution is made. Restitution should be included in the sentence imposed, and the government asks, as the PSR suggests at ¶ 17, that this Court set a restitution hearing 90 days after the sentencing date to allow sufficient time to determine what restitution, if any, is due to the victims.

**Conclusion**

For all the above-stated reasons, the government respectfully requests that this Court depart upward and/or vary upward from the advisory Guideline sentencing range, and impose a sentence of imprisonment of 36 months, followed by a three-year term of supervised release including mandatory mental health treatment.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: /s/ *Edward N. Stamm*
Edward N. Stamm
Assistant United States Attorney
U.S. Attorney's Office – SDFL
FL Bar #373826
99 NE 4th Street, 8th Floor
Miami, Florida 33132
Tel: (305) 961-9164
Email: Edward.Stamm@usdoj.gov

By: /s/ *Nardia Haye*
Nardia Haye
Assistant United States Attorney
U.S. Attorney's Office – SDFL
Court ID No. A5502738
99 NE 4th Street, 6th Floor
Miami, Florida 33132
Tel: (305) 961-9326
Email: Nardia.Haye@usdoj.gov