UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-60050-Altman

UNITED STATES OF AMERICA,
        Plaintiff,

v.

MELANIE HARRIS,
        Defendant.
_____/

**RESPONSE TO UNITED STATES' MOTION FOR
UPWARD DEPARTURE AND/OR VARIANCE**

The most serious types of threats cases are those where the defendant has shown a willingness to turn threats into actual violence. This is not one of those cases.

Despite the lack of any evidence that Ms. Harris intended to carry out her threats, the United States is requesting the Court impose a disparate sentence. Data from the sentencing commission shows that a 36-month sentence, two times higher than the middle of the advisory guideline range, would be higher than even the average sentence for defendants similar to Ms. Harris but who had also evidenced an intent to carry out their threats.

Likewise, the quantity and content of the voicemails and calls in this case do not justify a 36-month sentence. The anti-Semitic nature of Ms. Harris's conduct is already accounted for by the three-level hate crime enhancement found in §3A1.1. And while the conduct in this case is undeniably vulgar and offensive, it does not rise to the level of the cases cited by the Government where courts departed upward pursuant to §5K2.8.

Accordingly, the Court should deny the Government's Motion for Upward Departure.

## I. The Government's Request is Unmoored from the Sentencing Guidelines and Comparable Cases.

The Government is asking this Court to impose a sentence that is twice as severe as the sentencing guidelines recommend as appropriate. But the magnitude of the Government's requested upward departure would (1) result in a sentencing disparity; and (2) put Ms. Harris's conduct on par with defendants who intended to carry out their threats to injure or kill a person.

### A. A 36-month sentence would be a disparate sentence.

The Government's Motion for Upward Departure argues that the base offense level in §2A6.1 does not adequately account for Ms. Harris's conduct in this case. U.S. Sentencing Commission data shows that is not true.

First, while the Government is correct that §2A6.1 covers less serious conduct such as false liens, the guideline also covers more serious conduct such as threatening to destroy aircraft; willfully and maliciously conveying false information about a crime; threats against the President, successors to the presidency, former Presidents, and foreign officials; hoaxes involving serious bodily injury or death; conspiracies to sabotage or disrupt railroads, mass transportation, or maritime vessels or facilities; and threats of terrorism that transcend national boundaries.

Second, while the sentencing commission did include departure provisions in the application notes to §2A6.1, the commentary makes clear that what makes a threats case more or less serious is "the defendant's intent and the likelihood that the

2

defendant would carry out the threat." USSG §2A6.1, comment. (Background). That is why the sentencing commission chose to adopt fewer specific offense characteristics and instead purposely created the six-level enhancement in §2A6.1(b)(1) to distinguish the significantly more serious threats cases—where an intent to carry out the threat is evident—from the less serious threats cases where no such intent exists. Here, a 36-month sentence is equivalent to a sentence at the top of the guideline range if the offense level was 19 or a sentence in the middle of the guideline range if the offense level was 20. In other words, the Government is asking the Court to impose a sentence as if Ms. Harris had shown an intent to carry out the threats. But as the data below shows, even in those cases where defendants did evidence an intent to carry out their threats, most courts departed downward and imposed sentences lower than what the Government is asking for in this case.

The Court should consider the following data from the U.S. Sentencing Commission's Individual Datafiles for fiscal years 2018-2022. Ms. Harris's Motion for a Downward Departure cited JSIN data showing an average sentence of 12 months for defendants with the same total offense level and criminal history category. The data below is far more granular and is publicly available at: https://www.ussc.gov/research/datafiles/commission-datafiles. [1] The table below shows that the sentence requested by the Government is more severe than the mean and median sentences of defendants who both (1) made more than two threats and

---

[1] The sentence length data from the individual datafiles is used in the online JSIN database.

(2) evidenced an intent to carry out those threats:

TABLE 1[2]

**§2A6.1, Nationwide, 3 points for acceptance, BOL = 12, (b)(1) intent enhancement (+6), (b)(2) more than 2 threats enhancement (+2), Criminal History Category I, Statutory Maximum of Underlying Offense ≥ 5 years. (n=16)**

|    | District | Age | Vuln. Vict. / Hate Crime | Disrupt. Public/Gov Function | TOL | GL Range | Sentence Imposed (in Mos.) | Month Departure / Percent Departure |
|----|----------|-----|--------------------------|------------------------------|-----|----------|----------------------------|-------------------------------------|
| 1  | WDNY     | 48  |                          |                              | 17  | 24-30    | **.92 (CTS)**              | 23.08 / -96%                        |
| 2  | WDTX     | 37  |                          |                              | 17  | 24-30    | **8.1 (CTS)**              | 15.90 / -66%                        |
| 3  | EDNC     | 35  |                          |                              | 17  | 24-30    | **12.03**                  | 11.97 / -49%                        |
| 4  | MDFL     | 39  |                          |                              | 23  | 46-57    | **12.03**                  | 33.97 / -74%                        |
| 5  | DNM      | 38  |                          |                              | 23  | 46-57    | **20.70**                  | 25.30 / -55%                        |
| 6  | SDTX     | 19  |                          | X                            | 21  | 37-46    | **24.00**                  | 13.00 / -35%                        |
| 7  | WDNY     | 50  |                          |                              | 17  | 24-30    | **24.00**                  | Bottom of GL                        |
| 8  | NDTX     | 43  |                          |                              | 17  | 24-30    | **24.00**                  | Bottom of GL                        |
| 9  | MDTN     | 28  |                          |                              | 19  | 30-37    | **30.00**                  | Bottom of GL                        |
| 10 | EDNY     | 74  | X                        | X                            | 24  | 51-60    | **30.00**                  | 21.00 / -41%                        |
| 11 | SDTX     | 47  |                          | X                            | 21  | 37-46    | **37.00**                  | Bottom of GL                        |
| 12 | EDKY     | 24  |                          | X                            | 21  | 37-46    | **46.00**                  | Top of GL                           |
| 13 | NDTX     | 25  |                          |                              | 17  | 24-30    | **46.00**                  | 16.00 / -53%                        |
| 14 | EDVA     | 36  |                          |                              | 25  | 57-71    | **57.00**                  | Bottom of GL                        |
| 15 | MDPA     | 28  | X                        |                              | 25  | 57-71    | **57.00**                  | Bottom of GL                        |
| 16 | NDTX     | 22  |                          | X                            | 23  | 46-57    | **57.00**                  | Top of GL                           |

The median sentence for this subset of defendants was 27 months. The mean average sentence was 30.32 months. Of the sixteen defendants in this subset, half received a downward departure. Of those eight defendants receiving a downward departure, the average downward departure resulted in a sentence over 20 months below the advisory guideline range. Notably, of the two defendants who received enhancements

---

[2] The original dataset included 18 defendants. The high sentence, 60 months, and the low sentence, probation, were excluded as outliers. Their inclusion would not change the median and would have decreased the mean average by 0.04 months.

for vulnerable victim or hate crime motivation, one defendant, who was also enhanced for disrupting an official function, received a 21-month downward departure, and the other defendant received a sentence at the bottom of the guideline range. None of the defendants received an upward departure, and only two received sentences at the top of the guideline range.

The Government's request would impose a sentence on Ms. Harris that is more severe than the type of defendant who the sentencing commission has identified as more dangerous and more deserving of a higher sentence. By adopting § 3553(a)(6), Congress and the Executive have determined that it is necessary for courts to avoid unwarranted sentence disparities. Here, because a sentence of even 27 months would create a sentencing disparity, the Government's request of 36 months is unreasonable and should be rejected.

### B. The cases cited by the Government are not disparate.

The Government argues that a sentence within the advisory guideline range would unfairly treat Ms. Harris's conduct as similar to two cases from this district where the defendants received sentences of 14- and 12-months. Those two cases, however, have their own sets of aggravating facts that render their attendant sentences far less disparate than the Government's Motion suggests.

1. *United States v. Hanson Larkin*, Case No. 19-20702-CR-Martinez.

A more in-depth examination of Mr. Larkin's case reveals that his case was not as straightforward as the Government suggests. First, the Government originally sought a sentence of 12 months for Mr. Larkin's offense conduct. That conduct, while

admittedly over a much shorter period of time than the instant case, involved a specific threat to "use the gun he said he had recently purchased to a kill a number of Jews unless L.R. [an online friend of his] would meet with him in person." *See United States v. Larkin*, Case No. 19-20702-CR-Martinez, at D.E. 24 (USA Sent. Memo.) at 5. The FBI investigated the case "on an emergency basis" and assumed that there was an imminent threat to local Jewish communities in South Florida. At the time that the United States wrote its sentencing memorandum requesting a sentence of 12 months, it noted that it was "fortunate that Larkin does not appear to have had the actual intent or means to carry out the threat." *Id.* at 6.

Prior to sentencing, however, the United States received a forensic analysis of Mr. Larkin's phone. It revealed "a large volume of extremely disturbing and highly relevant internet searches relating to topics including firearms, ammunition, and accessories, deals on firearms, mass murders, murder suicides, and disfigurement revenge, during the approximately two-month period" leading up to the offense conduct. *Id.* at D.E. 29 (Gov't Resp. in Support of Def.'s Mot. to Determine Present Mental Condition) at 2-3. Based on that new information, and after Mr. Larkin's competency to proceed was confirmed, the United States filed a supplemental sentencing memorandum indicating that it was withdrawing its 12-month sentence recommendation and would seek an upward variance from the 12-18 month guideline range. *See id.* at D.E. 38. Mr. Larkin received a 14-month sentence.

And finally, while both Ms. Harris and Mr. Larkin could be described as "mentally troubled," Mr. Larkin's mental illness appeared to be far more serious and

was more likely to lead to possible violence. There is no evidence that Ms. Harris intended to commit any acts of violence against the victims in this case, nor is there any indication by any mental health professionals that Ms. Harris is a danger to anyone else.

        2. <u>*United States v. Gerald Wallace*, Case No. 17-20354-CR-Cooke.</u>

Mr. Wallace was charged with violations of 18 U.S.C. § 247(a)(2), intentionally obstructing by threat of force a person's free exercise of religion, and 18 U.S.C. § 875(c), communicating a true threat. Mr. Wallace's offense conduct involved more than just one threatening call to a local mosque. Mr. Wallace tried calling two other mosques before he left a message on the voicemail of the Masjid Miami Gardens and threatened to shoot its congregants. During an interview with the FBI, he admitted to leaving similar voicemails months earlier at two other mosques in south Florida. He also admitted sending emails to various mosques wherein he described his hate for Muslims. One of those emails was from December 2015, over a year before the offense conduct to which he pleaded guilty. Mr. Wallace also admitted to the FBI that he had obtained a permit to carry a concealed firearm and that his longstanding hate for Muslims had started shortly after September 11, 2001.

In a sentencing memorandum supporting a within-guidelines sentence of 12 months, the United States noted that Mr. Wallace's acceptance of responsibility and lack of criminal history counseled for a within-Guidelines sentence. The guidelines in Mr. Wallace's case were lower than in Ms. Harris's case because the United States allowed him to plead to a violation of § 247(a)(2), with a base offense level of 10 under

§2H1.1, versus § 875(c), with a base offense level of 12 and a 2-level enhancement for more than two threats (and the possibility of a six-level enhancement). Mr. Wallace's advisory guideline range was 12-18 months.

### 3. A more apt comparison to the instant case is *United States v. Catalano*, Case No. 22-CR-20356-Scola.

Mr. Catalano pleaded guilty to violating 18 U.S.C. § 2261A(2)(B) by cyberstalking the father of a teenage girl who was murdered during the mass shooting at Marjorie Stoneman Douglas High School in February 2018. Over the course of seven months, Mr. Catalano sent over 200 e-mail messages to the father. *See* Case No. 22-CR-20356-Scola, D.E. 1 (Complaint) at 5. Many of Mr. Catalano's messages described the daughter's death in graphic detail and celebrated the shooting. Several messages also claimed that the girl's father, among others, molested and raped his daughter before she was killed. *See id.*; *see also* D.E. 46 (Gov't Sent. Memo.) at 1. Mr. Catalano also "targeted several of the victim's associates in the same manner," and sent messages to other advocates against gun violence expressing hope that they would die. D.E. 46 at 5.

The United States' sentencing memorandum noted that "the instant offense was not an aberration…the defendant engaged in nearly identical conduct in 2021 and, despite being warned by law enforcement and avoiding criminal charges, the defendant escalated his conduct by finding a new victim and sending even more frequent and more disturbing messages." D.E. 46 at 3.

Unlike Ms. Harris, who has been compliant with her antipsychotic medication and showed marked improvement in her functioning, Mr. Catalano "refused to

8

engage in psychiatric treatment" while on pretrial release. *Id.* at 3-4. He also refused to sign medical and other release forms as part of U.S. Probation's presentence investigation. *Id.* at 4.

The sentencing guidelines treat cyberstalking as the equivalent of communicating a true threat *and* committing conduct evidencing an intent to carry out that threat. *Compare* USSG §2A6.2, *with* §2A6.1. The base offense level for cyberstalking is 18 and the adjusted offense level for true threats, with the six-level intent enhancement, is also 18. Mr. Catalano was able to negotiate a plea agreement where no enhancements—including the vulnerable victim enhancement or the two-level pattern of activity enhancement—applied. *See* D.E. 26 (Plea Agmt.) at 3-4. His total offense level, after acceptance, was 15, yielding an advisory guideline range of 18-24 months.

The United States sought a sentence of 20 months in Mr. Catalano's case. The court varied downward and sentenced Mr. Catalano to 12 months in prison.

### C. Ms. Harris's offense conduct—while undoubtedly offensive and hurtful—was not <u>unusually</u> heinous, cruel, brutal, or degrading.

Two things can be true at the same time. Many of the calls and voicemails by Ms. Harris in this case were crude, vulgar, and anti-Semitic. At the same time, many were also nonsensical, repetitive, vague, and manic. Some voicemails were just the same phrase or word repeated dozens of times. The vast majority of the calls did not include threats. And many of the voicemails were just a single sentence or a single word. Even in the calls where one of the victims, L.M., tries to interact with Ms. Harris, Ms. Harris just continues repeating herself as if she was a recording on

9

repeat. On some of the calls even L.M. is confused by Ms. Harris's phrasing and asks, "What does that mean?" In another call, L.M. asks, "Do you speak in sentences, ever?" Again, this is not to say that Ms. Harris's conduct was not vulgar or seemingly hateful—her most used word in all of the calls is a single anti-Semitic slur—but rather to highlight that her conduct was by and large more bizarre than it was threatening.

1. <u>The three-level enhancement from §3A1.1 accounts for the anti-Semitic nature of Ms. Harris's conduct.</u>

The Government argues that §2A6.1(a)(1) does not "address the underlying conduct in a case such as this, which featured threatening and harassing anti-Semitic communications spanning four years." (D.E. 95 at 8). That is correct. The anti-Semitic content of the voicemails and calls in this case are accounted for in a different chapter of the sentencing guidelines. Section 3A1.1(a) imposes a three-level increase in cases where the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim as the object of the offense because of the victims' race, religion, or ethnicity. Ms. Harris's advisory guideline calculation already includes that enhancement.

Because Ms. Harris's anti-Semitic comments are already accounted for by the three-level enhancement in §3A1.1, they should not be considered when analyzing whether an upward departure under §5K2.8 is warranted. Section 5K2.8 is reserved for extreme conduct that takes a case outside of the heartland of threats cases. For the reasons below, this is not one of those cases.

> 2. This case is not outside the heartland of cases considered by the Sentencing Commission in formulating §2A6.1.

Putting the content of the calls and voicemails aside, the Government argues that a sentence twice as long as the middle of the advisory guideline range is warranted by the number of calls and the duration of the offense conduct.[3] It also argues that §5K2.8 should apply and that Ms. Harris's conduct was "unusually heinous, cruel, brutal, or degrading to the victim[s]." (D.E. 95 at 11-12.)

Section 5K2.8, however, is reserved for cases outside the "heartland" of cases considered by the Sentencing Commission in formulating §2A6.1. *See* USSG Ch.1, Pt.A, p.s. 4(b) Departures ("When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."); *see also Koon v. United States*, 518 U.S. 81, 96 (1996) ("The court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."). The cases cited by the Government are inapposite.[4]

The *Taylor* case, which the Government cites in its Motion, involved approximately one thousand cards and letters sent to a family over a span of twenty years. *See United States v. Taylor*, 88 F.3d 938, 946 (11th Cir. 1996). Not only was

---

[3] One of the reasons that it took so long to indict and apprehend Ms. Harris was that her calls and voicemails did not contain threats until October 2022.

[4] The court in *Taylor* also cited *United States v. Moyano*, 983 F.2d 236 (Table) (11th Cir. 1992). Due to its age, *Moyano* is not available on any commercial database nor is it available from the Eleventh Circuit on PACER. Notably, a search on Westlaw of "2A6.1" and "5K2.8" yields only the *Taylor* case as a result.

11

the time span and number of communications far longer than in this case, but the conduct by the defendant was specifically designed to degrade and humiliate the victims by involving third parties. Mr. Taylor wrote letters to the victim's employer, sent a stripper to the school where one of the victims worked as a principal, and offered the victims' neighbors money for nude photos of the family. *See id.*

Likewise, the *Gary* case is also distinguishable from the present case. While the timespan of the threats and harassment in *Gary* was shorter than the time period here, the quantity and quality of the conduct was far more serious and exceptionally depraved. First, Mr. Gary and the victim had a pre-existing romantic relationship and had first met in person in Raleigh, North Carolina when they were both employed at a golf shop. Starting in July 1990, after a brief long-distance relationship ended, Mr. Gary began calling the victim 5-7 times a day at work and writing her angry letters. *United States v. Gary*, 18 F.3d 1123, 1125 (4th Cir. 1994). Starting the next month, Mr. Gary would "call repeatedly until four in the morning and sent up to eight letters a day, each six to eight double-sided pages long." *Id.* In response, the victim changed her phone number, but the calls continued. The victim was forced to resign from work. Mr. Gary threatened to return to Raleigh at Christmas and harm the victim and her family. In February 1991, Mr. Gary went to the victim's house and started pounding on the door and threatening her. In June 1991, Mr. Gary was convicted of communicating threats in state court and sentenced to six months in jail. After he was released, he continued writing the victim threatening letters. The Fourth Circuit panel described the letters as "gruesome" and "often written in the

12

defendant's own blood and detailed the gory specifics of innumerable tortures Gary planned to inflict" on the victim and her roommate. *Id.* at 1126. That is the type of case encompassed by §5K2.8—not Ms. Harris's case.

The Government also argues that naming the victim in the threats is unusual enough to warrant an upward departure. (D.E. 95 at 11.) 18 U.S.C. § 875(c) requires transmission of a true threat: a serious threat that is made under circumstances that would place a reasonable person in fear of injury. In many cases, to meet that threshold of culpability, true threats contain the name of the victim. In other cases, unlike this one, that threshold might be met by evidence that the defendant mentioned a victim's residence, place of work, or other identifying information. In other words, generic threats aren't illegal; the heartland of threats cases require exactly the type of information that the Government is now arguing is unusual.

## II. The remaining § 3553(a) factors do not support a 36-month sentence.[5]

### A. Section 3553(a)(2)

Ms. Harris and the Government agree that this case involves a serious offense. But a sentence that is twice as severe as the middle of the advisory guideline range is much greater than necessary to comply with the requirements of § 3553(a)(2). A just punishment requires proportionality. Because the Government's request for a 36-month sentence is untethered from comparable cases—whether cherry-picked or data-driven—the Court should reject its argument that a 36-month sentence

---

[5] Ms. Harris's opposition to an upward variance relies on the same arguments as her opposition to an upward departure. She would ask the Court to consider those same arguments as incorporated into this section.

comports with "every facet" of § 3553(a)(2).

A "strong message of deterrence" can be accomplished with a sentence significantly shorter than 36 months. District courts across the country have come to the conclusion that the type of defendant who must be deterred the most in this context—those who intend to carry out their threats—should receive sentences much shorter than 36 months. *See* Section I.A., *supra*.

With respect to protecting the public, Ms. Harris, for the first time in her life, is receiving antipsychotic medication for her serious mental health issues. There is no evidence that she intended to commit any acts of violence against the victims in this case. Neither Dr. Feldman nor Dr. Cunliffe found that Ms. Harris exhibited any indicators of a penchant for violence such as severe antisocial personality disorder, psychopathy, or sadistic beliefs or intentions. If Ms. Harris continues on her medication and receives mental health treatment, her prognosis is good. The most effective manner to get Ms. Harris that treatment is not in a correctional environment such as prison. Supervised release provides the necessary structure and incentives to ensure that Ms. Harris continues to take her medication and attends the in-patient or out-patient programs necessary to maintain her mental health.

## III. Conclusion

A major departure should be supported by a more significant justification than a minor one. *Gall v. United States*, 552 U.S. 38, 50 (2007). The Government is requesting a major upward departure but has provided the Court little justification for a sentence of 36 months. The quantity of calls in this case—243 over four years—

14

is serious. But to equate the frequency and the speech contained in those calls with conduct evidencing an intent to actually commit physical violence is both unreasonable and creates a bizarre hierarchy where a defendant with no intention of committing violence is sentenced more harshly than a defendant intending to commit physical violence.

The Government's Motion should be denied.

Respectfully Submitted,

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

*s/ Andrew S. Jacobs*
Andrew S. Jacobs
Assistant Federal Public Defender
Florida Special Bar No. A5502687
150 W. Flagler St., Ste. 1700
Miami, FL 33130
305-533-4201
Andrew_Jacobs@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on May 13, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: */s/ Andrew S. Jacobs*
Andrew S. Jacobs